## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

| | | |
|---|---|---|
| U.S. ACCU-MEASUREMENTS, LLC | : | CIVIL ACTION |
| and | : | |
| ROSS CONSULTING GROUP, INC. | : | |
| | : | |
| Plaintiffs | : | NO.   10-CV-05011 |
| v. | : | |
| | : | |
| RUBY TUESDAY, INC. | : | |
| | : | |
| Defendant | : | |

## DEFENDANT'S STATEMENT
## OF MATERIAL FACTS NOT IN DISPUTE

Defendant, Ruby Tuesday, Inc., hereby submits the following statement of material facts not in dispute in support of its Motion to Preclude Expert Testimony and for Summary Judgment:

1.    This action arises from the alleged breach of a contract for commercial lease auditing services.  Plaintiffs' Complaint, "First Count," ¶¶ 1-4.

### LEASE AUDITS AND THE INSTANT CONTRACTS

2.    Under the contract, plaintiff U.S. Accu-Measurements, Inc. (USAM) was to prepare lease audits for Ruby Tuesday by reviewing common area maintenance costs landlords charged to Ruby Tuesday to find inaccuracies or overcharges based on Ruby Tuesday's particular lease terms.

*See* Contract for Commercial Lease Analytical and Space Cost Occupancy Verification Services, executed May 27, 1998 (hereinafter "1998 Agreement"), attached hereto as Exhibit A.

3.      In a shopping center, operating expenses associated with maintaining common areas (known as common area maintenance or "CAM" costs) such as electricity, cleaning, and similar expenses, are typically apportioned to tenants in the form of an annual *pro rata* CAM charge.  *See* Affidavit of Kevin Reeve, Esquire, Ruby Tuesday Assistant General Counsel and Assistant Secretary (hereinafter "Reeve Affidavit"), attached hereto as Exhibit B.

4.      The specific services and costs a landlord may include in a tenant's *pro rata* CAM charge are limited by the particular terms of the tenant's lease.  Reeve Affidavit, Exhibit B.

5.      Thus, the 1998 Agreement states that plaintiff USAM's services were to include, *inter alia*, "a quantification of overcharges attributable to [costs] improperly passed through, miscalculated, or mis-allocated" by the landlord to Ruby Tuesday, and "quantifying all matters discovered to be overcharges, but in a 'gray area' of possible entitlement".  *See* 1998 Agreement, Exhibit A, at ¶¶ 4-5.

6.     The 1998 Agreement states that plaintiff USAM's remuneration would be "contingent and based upon a realization in fact by [Ruby Tuesday] of refunds made by landlords or their assigns, predicated upon information documented by [plaintiff] that overcharges in fact occurred" and "is to be made to [plaintiff] by [Ruby Tuesday] only when, as and if refunds and cost reductions are realized".  1998 Agreement, Exhibit A, at 1.

7.     Where Ruby Tuesday recovered refunds or cost reductions from a landlord as a result of plaintiff's audit, USAM was to receive fifty percent of that recovery.  1998 Agreement, Exhibit A, at 1.  Plaintiffs' Complaint, "Relevant Facts," ¶ 4.

8.     On April 6, 2001, Ruby Tuesday entered into a contract with plaintiff Ross Consulting Group (RCG) which "incorporate[d]" the 1998 Agreement with USAM.  *See* Authorization to Proceed with Simon Audit, executed April 6, 2001 (hereinafter "2001 Agreement"), attached as Exhibit C, at 1.  *See also* Deposition Transcript of Charles Ross, RCG President and Federal Rule of Civil Procedure 30(b)(6) corporate designee (hereinafter "Ross Dep. Tr."), attached hereto as Exhibit D, at 76:6-77:9.

9.     According to the 2001 Agreement, RCG was to audit leases for Ruby Tuesday's properties with landlord Simon Property Group (Simon),

3

and its remuneration was governed by the 1998 Agreement between USAM and Ruby Tuesday.  2001 Agreement, Exhibit C, at 1.

10.     At deposition, Charles Ross, President and Federal Rule of Civil Procedure 30(b)(6) corporate designee for RCG, testified that lease audits "are negotiated and not always settled for full amounts."  Ross. Dep. Tr., Exhibit D, at 133:2-133:3.

11.     Ross testified that the percentage of an audit claim recovered in settlement "varied depending on the merit of the claim" and "varied in part on how tough the landlord was."  Ross Dep. Tr., Exhibit D, at 136:2-136:7.

12.     Ross further testified that, under the contracts, Ruby Tuesday had the discretion to accept or reject plaintiffs' recommendations regarding negotiation and settlement of audits, had the discretion to decide "how hard to push the negotiations" with its landlords regarding audits, and had the discretion to accept or reject a settlement offer from its landlord regardless of plaintiffs' opinion of the offer.  Ross Dep. Tr., Exhibit D, at 322:19-323:14.

13.     Early in the parties' contractual relationship, plaintiffs and Ruby Tuesday experienced relative success in obtaining recoveries from Ruby Tuesday's landlords; over time, however, the recoveries "slowed."

*See* RCG memorandum dated August 6, 2008 (hereinafter "RCG 2008 Memorandum"), attached hereto as Exhibit E, at 1.

14.   Ross testified as follows regarding the arc of an auditing relationship with RCG's clients:

> Q:   [Attorney Edward Greenberg]  What caused the work to dry up from your clients? . . . Do you know whether it was because existing clients went to other auditing companies or just lost interest in the auditing, or something else happened?

> A:   [Charles Ross]  . . . I don't have any knowledge they went to other auditing firms. But after you audit the same leases over and over again, sometimes you've, you know, you've milked it. . . . If you look at the same file two or three or four times, you may have found everything that's to be found.

> Q:   Is it part of the phenomenon that in the beginning of a relationship with a client, you get the low hanging fruit and then over time you work on some more difficult ones, you win some, you lose some, and then the really difficult ones just die on the vine?

> A:   Well, partially.  I don't know the difficult ones die on the vine.  Actually, the difficult ones, if you handle them right, you still can collect on them. . . . And of course, some were more difficult than others.

Ross Dep. Tr., Exhibit D, at 24:3-25:6.

## THE SIMON AND GGP AUDITS

15.     In or around 2003 and 2001, respectively, plaintiffs prepared lease audits against Ruby Tuesday landlords Simon and General Growth Properties (GGP).  *See* RCG memorandum dated August 29, 2006 (hereinafter "RCG 2006 Memorandum"), attached hereto as Exhibit F, at 1. *See also* email from RCG auditor Susan McCully to Ruby Tuesday, dated November 6, 2003, attached hereto as Exhibit G, at 1.

16.     The Simon audit involved twenty-seven Ruby Tuesday restaurants at Simon-owned shopping centers and was prepared based upon an audit of CAM charges at three of these properties for the year 2000 and one property for the year 1999.  *See* Revised Report of Ross Consulting Group on Simon Property Group, dated November 2004 (hereinafter "Simon Audit Report"), attached hereto as Exhibit H, at RTI009050-52 and RTI009054 (listing the twenty-seven properties included in the report and the four properties actually audited).

17.     The results from the four audited properties were then extrapolated to include estimates for the remaining twenty-three properties and for the years following year 2000.  Simon Audit Report, Exhibit H, at RTI009082 ("The [four] field audit results were used as basis of estimating the claim for all of the locations that were not audited.").

18.     RCG auditor Bill Dornan advised Ruby Tuesday years later:

> Keep in mind that the current [Simon] claim is
> based upon the one year that was audited and eight
> years of estimates [thereafter].  The estimates
> assume that the issues detected on the 2000 CAM
> have continued.  There is no way to accurately
> quantify the assumptions other than by completing
> additional audits at Simon['s offices].

*See* Email from Bill Dornan to Ruby Tuesday dated January 2, 2009

(hereinafter "Dornan 2009 Email"), attached hereto as Exhibit I.

19.     The GGP audit involved two Ruby Tuesday-operated

restaurants at a mall known as Mizner Park in Boca Raton, Florida, which

was owned by landlord The Rouse Company and purchased by landlord

GGP in 2003.  Plaintiffs' Complaint, "Relevant Facts," at ¶8(i); RCG 2008

Memorandum, Exhibit E, at 2 (stating that GGP acquired the property in

2003).

20.     In this litigation, plaintiffs allege that Ruby Tuesday used their

audits to extract benefits in settlements with landlords Simon and GGP, but

failed to compensate plaintiffs for such benefits.  Plaintiffs' Complaint,

"Relevant Facts," at ¶¶ 10-12.

21.     In their Complaint, plaintiffs allege that the Simon audit was

worth $1,052,000 and that the GGP audit was worth $900,000.  Plaintiffs'

Complaint, "Relevant Facts," at ¶¶ 8(g), 8(i).

7

22.     Plaintiffs' valuation of these audits, however, has changed significantly over time.  Ross Dep. Tr., Exhibit D, at 258:14-258:23 (testifying to changes in value); RCG 2008 Memorandum, Exhibit E, at 1-2 (outlining claim history); RCG 2006 Memorandum, Exhibit F, at 1 (same).

23.     In 2004, plaintiffs valued the Simon audit at over $1.4M, but changed the valuation to $594,000 by year's end, and reduced it again to $270,000 in 2006.  Ross Dep. Tr., Exhibit D, at 258:14-258:23; RCG 2008 Memorandum, Exhibit E, at 1-2; RCG 2006 Memorandum, Exhibit F, at 1.

24.     In 2009, plaintiffs offered Ruby Tuesday two values for the Simon claim:  $587,000 (omitting weaker portions of the claim), or alternatively, $1,052,000 (including all portions of the claim).  Dornan 2009 Email, Exhibit I, at 1-2.

25.     Similarly, plaintiffs first valued the GGP audit at $227,538 for years 1997 to 1999, then increased the value to $920,094 through year 2005, but "conceded" a portion and reduced it to $863,309.  Ultimately, plaintiffs increased the value again to $900,000 through year 2007.  RCG 2006 Memorandum, Exhibit F, at 2-3.

26.     David Hibbard, Director of Assets for Ruby Tuesday, expressed doubts regarding the merit of the Simon claim.  Hibbard testified that "some of the bases for the claim, I didn't entirely agree with," and "I wasn't

convinced [the claim] had merit."  Deposition Transcript of David Hibbard,
Ruby Tuesday Director of Assets (hereinafter "Hibbard Dep. Tr."), attached
hereto as Exhibit J, at 49:14-50:25, 64:21-64:22.

27.    Plaintiffs have admitted to Ruby Tuesday at various times that
the Simon claim contained weaknesses and was vulnerable to challenge.
RCG auditor Bill Dornan conceded that a portion of the claim was "not rock
solid," and USAM managing and sole member Martin Mayer opined that a
portion of the claim was "without merit."  RCG 2006 Memorandum, Exhibit
F, at 1; Dornan 2009 Email, Exhibit I, at 1.  *See also* Ross Dep. Tr., Exhibit
D, at 233:24-234:2 (testifying that Dornan "was probably the most honest
auditor I've ever met").

28.    When the parties presented the audit claims to GGP and Simon,
respectively, GGP disputed the audit value and Simon rejected the audit
entirely.  *See, e.g*., RCG 2006 Memorandum, Exhibit F, at 1-3.

29.    RCG auditor Dornan noted in 2006 that Simon "has totally
rejected the entire claim and as far as they are concerned, it is a dead issue."
RCG 2006 Memorandum, Exhibit F, at 1.  *See also* Dornan 2009 Email,
Exhibit I, at 1 (stating, "Simon has basically ignored everything that has
been communicated to them").

30.     Dornan also noted that Simon and GGP "are two of the largest landlords in the [United States] and take the position that they control 'the playing field' involving all tenant/landlord disputes."  RCG 2006 Memorandum, Exhibit F, at 1.

31.     Ross admitted that at the time plaintiffs' audit was presented to Simon, Simon was "one of the toughest landlords to deal with."  Ross Dep. Tr., Exhibit D, at 136:12-136:15.

32.     Ross also admitted that Simon used its size to its advantage in negotiating with tenants, and that tenants with multiple locations at Simon-owned properties could not simply "say . . . goodbye to you, because of [the importance of the tenant's] relationship with [Simon]."  Ross Dep. Tr., Exhibit D, at 60:13-63:3.  *See also id.* at 183:16-184:3 (acknowledging "the importance of a maintaining a relationship with a landlord that has a big part of the market and has a lot of [the tenant's] stores").

33.     Plaintiffs suggested various strategies to spur Ruby Tuesday's landlords to settlement, and recommended that Ruby Tuesday offer to settle the claims at a fraction of their purported value.  *See, e.g*., Ross Dep. Tr., Exhibit D, at 258:14-259:4 (testifying to plaintiffs' varying settlement recommendations); RCG 2006 Memorandum, Exhibit F, at 1-3 (recommending Ruby Tuesday offer to settle the Simon claim for just 33%

of its purported value and, for the GGP claim, recommending Ruby Tuesday offer to "split it 50-50"); Dornan 2009 Email, Exhibit I, at 1-2 (setting forth recommendations).

34.    Ross admitted that in 2006, RCG recommended that Ruby Tuesday offer to settle the Simon claim for one-seventh of its purported value.  He testified as follows:

> Q:    [Attorney Edward Greenberg]  . . . So when this memo was written by Mr. Dornan on August 29, 2006, he was suggesting that a new settlement proposal be sent to Simon offering to take one-seventh of the amount initially put into the claim?
>
> A:    [Charles Ross] Yes, basic math appears so, yes.

Ross Dep. Tr., Exhibit D, at 261:2-261:6.

35.    Still no settlements were achieved and by mid-2007 Ruby Tuesday put the audits aside.  Reeve Affidavit, Exhibit B; Ross Dep. Tr., Exhibit D, at 326:5-326:9 (admitting that "for seven years [plaintiffs] had given Ruby Tuesday ideas as to how to settle [the outstanding audits] and the settlement[s] never materialized").

## ECONOMIC DOWNTURN AND THE INSTANT DISPUTE

36.    In 2008 and 2009, the casual dining segment of the United States restaurant industry fell into significant financial hardship as a result of

the recession.  Ruby Tuesday was forced to close over forty underperforming restaurants across the country.  Reeve Affidavit, Exhibit B. *See also* Deposition Transcript of Marguerite Duffy, Ruby Tuesday Chief Financial Officer (hereinafter "Duffy Dep. Tr."), attached hereto as Exhibit K, at 33:1-33:12 (testifying regarding store closings).

37.    Some of the underperforming restaurants that Ruby Tuesday closed were covered by leases that had not expired.  Ruby Tuesday therefore negotiated lease termination settlements with the landlords for some of these properties.  Reeve Affidavit, Exhibit B; Duffy Dep. Tr., Exhibit K, at 33:1-33:12.

38.    In each lease termination settlement, Ruby Tuesday was able to settle for an amount less than the total future rent due over the remaining life of the lease term; this was true even though no lease audits were in play in the majority of settlements.  Reeve Affidavit, Exhibit B.

39.    Lease terminations typically settle at 40 to 50 percent of future rent due.  *See* Report of Ronald Gorodesky (hereinafter "Gorodesky Report"), attached hereto as Exhibit L, at 4 (stating, "the discount range [achieved in lease termination settlements] can be from 10 percent to 90 percent, with 40 to 50 percent being most typical").  *See also* Chodor Dep. Tr., Exhibit P, *infra*, at 88:19-89:8 (plaintiffs' damages expert, Lawrence

Chodor, testifying that he does not disagree with Gorodesky's statement of the typical settlement range).

40.     In or around 2009, Ruby Tuesday began negotiations with landlord Simon to terminate leases for seven restaurants at Simon-owned shopping centers.  Duffy Dep. Tr., Exhibit K, at 33:1-33:12.

41.     While negotiations of the lease terminations were underway, Ruby Tuesday raised the issue of plaintiffs' long-unresolved audit; Simon, however, threatened to cease negotiations on the lease terminations unless Ruby Tuesday dropped the audit.  Duffy Dep. Tr., Exhibit K, at 36:15-36:25 (testifying that Ruby Tuesday executive Sandy Beall attempted to broach topic of audit during lease termination negotiations with Simon executive Rick Sokolov, who then said, "[I]f you'd like to talk about that CAM audit, we can discontinue the discussion of the leases now," to which Beall replied, "[N]o, let's continue.").

42.     Ruby Tuesday ultimately settled the lease termination package with Simon at a cost to Ruby Tuesday of approximately $2,015,000.  *See* Economic Damages Report of Lawrence Chodor (hereinafter "Chodor Report"), attached hereto as Exhibit M, at 2 (stating cost to Ruby Tuesday).

43.     This represented a settlement at 47.3% of the total future rent due through the lease expiration dates.  Chodor Report, Exhibit M, at 2 (calculating total rent due on the remaining leases to be $4,258,128).

44.     The 43.7% "discount" achieved by Ruby Tuesday falls within Gorodesky's stated "typical" 40 to 50 percent discount range for lease termination settlements.  *See* Gorodesky Report, Exhibit L, at 4.

45.     Instantly, plaintiffs allege that Ruby Tuesday used the lease audit to extract benefits in its negotiation of the settlement with Simon. Plaintiff's Complaint, "Relevant Facts," ¶¶ 10, 12.

46.     Plaintiffs concede, however, that they are unable to quantify the alleged benefits without the assistance of an expert.  Ross Dep. Tr., Exhibit D, at 125:16-126:25 (Q:  [Attorney Edward Greenberg] "Can you testify to any basis whatsoever today for the claim of $6 million [in damages alleged] by plaintiffs [in their Complaint]?"  A:  [Charles Ross] "No. . . . [U]ntil I have a forensic accountant go through some records . . . I don't think I can be more definitive.").  *See also* Deposition Transcript of Martin Mayer, USAM sole and managing member and Federal Rule of Civil Procedure Rule 30 (b)(6) corporate designee (hereinafter "Mayer Dep. Tr."), attached hereto as Exhibit N, at 25:17-25:25 ("[U]ntil we get a forensic audit showing

what the benefits were that Ruby Tuesday got . . . we have no idea [what plaintiffs' damages are].").

47.     Also in 2009, Ruby Tuesday reached a lease termination settlement with landlord GGP regarding a closed restaurant at the Mizner Park shopping center; GGP agreed to credit Ruby Tuesday $165,000 in back rent due in exchange for a waiver of plaintiffs' lease audit.  Reeve Affidavit, Exhibit B.

48.     Thereafter, Ruby Tuesday paid plaintiffs $82,500 (50 percent of savings achieved as a result of the audit) in accordance with the contract terms.  Reeve Affidavit, Exhibit B; Ross Dep. Tr., Exhibit D, at 321:13-321:14 (testifying to receiving check from Ruby Tuesday for $82,500).

49.     Plaintiffs allege that Ruby Tuesday received benefits from GGP due to the lease audit for which plaintiffs were not compensated.  Plaintiffs' Complaint, "Relevant Facts," ¶ 10.

50.     Plaintiffs testified, however, that they cannot describe or quantify the benefits that Ruby Tuesday allegedly received but failed to compensate plaintiffs for without the assistance of an expert.  Ross Dep. Tr., Exhibit D, at 125:16-126:25.  *See also* Mayer Dep. Tr., Exhibit N, at 25:17-25:25, 29:16-29:23, 39:12-39:16 (Q: "And what economic benefit did [Ruby Tuesday] get that they didn't pay you for?"  A:  "When I finish with my

[expert's] forensic audit on your company, I will then be able to answer that question.").

51.     Plaintiffs further allege that Ruby Tuesday had and breached a contractual duty to "work together" with plaintiffs in the ultimate settlement with GGP. *See, e.g.*, Ross Dep. Tr., Exhibit D, at 322:14-322:18 ("I think the agreements says, we're going to co-source, we're going to cooperate, we're going to work together . . . and I don't think it was followed.").

52.     However, when asked whether plaintiffs had any basis to believe that Ruby Tuesday could have achieved a more favorable settlement had plaintiffs been more closely involved, Ross admitted, "I don't know." Ross Dep. Tr., Exhibit D, at 321:17-321:20 (Q: "Do you have any basis to believe [Ruby Tuesday] could have gotten a better settlement?"  A: "I don't know.  I wasn't part of the loop.  I don't know.").  *See also id.* at 323:1-323:14 (admitting that, under the contract, it was Ruby Tuesday's decision to accept or reject any settlement and plaintiffs could not veto that decision); 326:5-326:9 (admitting that plaintiffs had given settlement advice to Ruby Tuesday for seven years and a settlement never materialized).

53.     Charles Ross and Martin Mayer, principals and Rule 30(b)(6) designees of plaintiffs RCG and USAM, testified that they would therefore engage an expert to calculate plaintiffs' alleged damages.  Ross Dep. Tr.,

Exhibit D, at 122:1-122:3 (testifying plaintiffs don't know "how the [audit] claims were used" or "what was extracted" by the audits in settlement), 125:13-125:23 (testifying, "until I have a forensic accountant go through some records and try and figure out what the real value of recovery [due to the audit] might have been" plaintiffs cannot state the basis for their damages claim); Mayer Dep. Tr., Exhibit L, at 39:8-39:16.

## REPORTS OF LAWRENCE CHODOR, C.P.A.

54.    Plaintiffs' expert, Lawrence Chodor, C.P.A., has now submitted a report and supplemental report setting forth his conclusions regarding plaintiffs' alleged damages.  Chodor Report, Exhibit M.  *See also* Supplemental Economic Damages Report of Lawrence Chodor (hereinafter "Chodor Supplemental Report"), attached hereto as Exhibit O.

55.    Chodor's Economic Damages Report concludes that plaintiffs' damages total $1,143,683; his Supplemental Economic Damages Report concludes that their damages total $1,238,745.  Chodor Report, Exhibit M; Chodor Supplemental Report, Exhibit O.

56.    Chodor used one methodology to calculate plaintiffs' alleged damages as a result of the Simon settlement, and a different methodology to calculate their alleged damages as a result of the GGP settlement.  *See* Chodor Report, Exhibit M.

17

57.     Chodor calculated plaintiffs' alleged damages as a result of the Simon settlement as follows:

(a)     Chodor first calculated that Ruby Tuesday owed Simon $4,258,128 in total future rent through the lease expiration dates.

(b)     Chodor then calculated the Net Present Value of total future rent due to be $3,567,365, using a risk-free rate of return.

(c)     Chodor then subtracted Ruby Tuesday's lease termination package settlement price ($2,015,000) from the Net Present Value of the total future rent due ($3,567,365) to determine the "Net Savings" Ruby Tuesday achieved in the settlement package to be $1,552,365.

(d)     Finally, Chodor calculated 50 percent of the "Net Savings" ($1,553,365) to be $776,183, and concluded that plaintiffs are therefore entitled to $776,183.

Chodor Report, Exhibit M, at 4.

58.     In his Supplemental Economic Damages Report, Chodor includes "a 3% Inflation Factor for expenses" and revises the Net Present

Value of total future rent due upward to $3,682,489.  This results in damages to plaintiffs for the Simon lease audit in the amount of $833,745.  Chodor Supplemental Report, Exhibit O, at 2.

59.   Thus, according to Chodor's conclusions, plaintiffs are entitled to 50 percent of Ruby Tuesday's net savings of $1,667,489 despite the fact that plaintiffs valued their audit at just $1,052,000.  Chodor Supplemental Report, Exhibit O, at 2.

60.   Chodor calculated plaintiffs' alleged damages as a result of the GGP settlement as follows:

(a)   The GGP audit submitted by plaintiffs totaled $900,000.

(b)   Plaintiffs are entitled to "50 percent of Gross Recovery" and 50 percent of $900,000 is $450,000.

(c)   Ruby Tuesday submitted payment to plaintiffs in the amount of $82,500.

(d)   Plaintiffs are therefore entitled to $367,500 ($450,000 minus $82,500) in "los[t] profits".

Chodor Report, Exhibit M, at 3-4.

61.   In his Supplemental Economic Damages Report, Chodor "adjusts" the GGP audit value to $975,000 "to reflect estimated claims of $25,000 for each year from 2008 to 2010" and determines that plaintiffs'

damages for the GGP audit therefore total $405,000.  Chodor Supplemental

Report, Exhibit O, at 2.

### REPORT OF RONALD GORODESKY

62.     On September 11, 2011, defendant's expert in this case, Ronald

Gorodesky, submitted a report which discusses seven factors that a mall or

shopping center landlord typically considers when negotiating a lease

termination settlement with a tenant.  Gorodesky Report, Exhibit L.

63.     Gorodesky discussed "Retail Vacancy Cost," or the cost of

distress to the shopping center as a whole caused by vacant retail space, as a

"major factor that a landlord considers when agreeing to terminate a lease

for a lump-sum payment."  Gorodesky Report, Exhibit L, at 2-3.

64.     Gorodesky stated, "When tenants leave, that tenant's customers

also leave, diminishing the customer population for the rest of the [retail]

Center.  Tenant vacancy can therefore be self-accelerating, since fewer

customers means less revenue for the remaining tenants."  Gorodesky

Report, Exhibit L, at 2.

65.     Gorodesky further explained, "landlords are therefore anxious

to re-lease closed stores [to a new tenant] as quickly as possible" rather hold

the current tenant to its lease and bear the consequence of a closed store in

the mall for the remainder of the lease term.  *See* Gorodesky Report, Exhibit L, at 2.

66.    Gorodesky also discussed the landlord's ability to obtain higher or additional rent as a factor considered by the landlord in lease termination negotiations; Gorodesky explained that "since lump sum payment [by the terminating tenant] effectively pays future rents ('Advanced Rent Payments'), it is possible that a new tenant's rent payment will overlap the Advanced Rent Payments, giving the landlord 'double rent'."  *See* Gorodesky Report, Exhibit L, at 3.

67.    Gorodesky also described five other factors that typically contribute to a landlord's decision to settle a lease termination with a tenant for less than full future rent due.  *See* Gorodesky Report, Exhibit L, at 3 (outlining a landlord's duty to mitigate, value of tenant improvements transferred to the landlord, satisfaction of potential claims, financial viability of the tenant, and length of remaining lease term).

## CHODOR'S TESTIMONY REGARDING GORODESKY'S FACTORS

68.     Chodor was deposed regarding his conclusions on October 14, 2011.  *See* Lawrence Chodor Deposition Transcript (hereinafter "Chodor Dep. Tr."), attached hereto as Exhibit P.

69.     When questioned regarding his experience with lease termination negotiations, Chodor testified that he has been involved in between three and five lease termination negotiations during his career, but he was never "directly in the negotiating room," and he could not recall "specific items within the negotiation[s]," how much the negotiations ultimately settled for, or what percentage of the tenant's future obligation the settlements represented.  Chodor Dep. Tr., Exhibit P, at 10:5-10:11, 12:12-13:18, 14:7-14:17, 15:15-15:18, 17:17-18:3.

70.     When asked if he disagreed with Gorodesky's statement that, "in [Gorodesky's] experience the discount range [in a lease termination settlement] can be from 10 percent to 90 percent, and with 40 to 50 percent being most typical," Chodor testified, "I don't disagree with his answer." Chodor Dep. Tr., Exhibit P, at 88:19-89:8.

71.     Chodor further testified, "I previously stated I have not been involved in a lot of lease termination negotiations.  So, do I know that this is an accurate range?  No."  Chodor Dep. Tr., Exhibit P, at 89:9-89:18.

22

72.     When questioned regarding Gorodesky's seven factors, Chodor admitted that the factors are "logical considerations" in a lease termination settlement that may have contributed to the savings Ruby Tuesday achieved. Chodor Dep. Tr., Exhibit P, at 64:8-64:9 (testifying of Gorodesky's factors, "yes, these are logical considerations that would go into a negotiation"); 96:4-96:8 (testifying, "I don't know what other factors were part of the negotiation.  I don't disagree with you that [Gorodesky's factors] may have been part of Simon's considerations.").

73.     Chodor further admitted that he cannot quantify the role of *any* factor, including that of plaintiffs' audits, toward the settlements achieved. Chodor Dep. Tr., Exhibit P, at 94:17-94:19 ("I have no way of knowing what percentage, what contribution to the settlement any of these individual items had, including the CAM audits.").

74.     Chodor testified:

> A:   [Lawrence Chodor]  What I'm saying is that when negotiating to terminate a lease for a lump sum payment, the factors that were listed here [in Gorodesky's report] are basic factors.  And I have no doubt that in a negotiation the negotiators are going to consider these factors. . . . My point is, you can't quantify. You can't put down on paper, well, 6 percent of the settlement was because of this factor and 8 percent was due to another.  These are just factors, just considerations in a negotiation.

Chodor Dep. Tr., Exhibit P, at 59:5-59:21.

75.     Chodor further testified that because he could not quantify the role of any particular factor in settlement, he utilized an "expansive view" of the contract to conclude that plaintiffs are entitled to fifty percent of *all* savings achieved regardless of the role of other factors:

>   A:   [Lawrence Chodor]  I don't know what percentage of the settlement amount was a result of the lease audits, but what I do know is they were part of it.  **I can't quantify** what part they were.  **And that's why I utilize the more expansive view** [of the contract] and the calculation of the higher dollar amount [of damages].
>
>   Q:   [Attorney Edward Greenberg]  . . . [So] it is your testimony that you don't know whether any of Gorodesky's seven factors came into play in the Simon/Ruby Tuesday lease termination negotiations, you don't know that they did or didn't?
>
>   A:   Correct.
>
>   Q:   Is there anywhere you can point me to in your August 15, 2011 report where you reached a conclusion on plaintiffs' economic damages where you considered any or all of those factors and discussed them?
>
>   A:   Read back the question.  [Whereupon, the requested portion is read back by the reporter.]  No, there is nothing in the report that indicates that.

Q:   . . . You have testified very clearly that you
don't know to what extent, if at all, the retail
vacancy cost factor influenced the
negotiations, correct?

A:   Correct.

Q:   And because you don't know whether that
factor influenced the negotiations at all, you
couldn't possibly quantify that factor and use
it in determining the relative contribution that
it made to the ultimate issues, to use your
term?

A:   Correct.

Q:   If you couldn't do that for the retail vacancy
cost factor [or Gorodesky's other factors],
how could you do it for the CAM audit claim?
In other words, how do you know that the
CAM audit claim was a factor, and how do
you know to what extent it was a factor?

A:   I know that it was a factor . . . but I don't
know what percentage it was a factor, what
leverage it had for Ruby Tuesday.  I think I
am very clear on that.  I don't know.  But I do
know that it was considered. . . . That's the
extent of it.

Q:   Do you have a basis to state the opinion that
the relative contribution of any or all of Mr.
Gorodesky's seven factors to the ultimate
settlement was so small as to be unworthy of
consideration?  In other words, *de minimis*?

A:   [The witness then requested and heard the
question read back by the reporter.] No, I
don't know.

25

Chodor Dep. Tr., Exhibit P, at 56:2-56:17, 61:8-62:1, 67:2-68:11 (emphasis

added).  *See also id.* at 66:16-66:23 ("We don't know what impetus the

CAM audits had on the ultimate resolution, but we know that they had some.

And according to the contract, my expansive interpretation of the contract, if

they used them . . . [plaintiffs] should get 50 percent of the savings.").

76.     Chodor denied that he attributed all savings achieved to

plaintiffs' audits; he testified as follows:

> Q:   [Attorney Edward Greenberg]  So what you
>      did, sir, is because you couldn't quantify any
>      of the seven factors, you couldn't assign a
>      relative contribution toward the ultimate
>      settlement of any of the seven factors that you
>      concede may or may not have been in play,
>      you assigned 100 percent to the CAM audit,
>      correct?
>
> A:   [Lawrence Chodor]  No, that's not what I did.
>      I think what I did was I had to consider the
>      Ruby Tuesday/Simon negotiations, but they
>      really don't have an impact on my calculation
>      of damages.  They are gonna reach a number.
>      What I was concerned with and what was
>      important to me was that the CAM audits
>      were a part of the negotiations.  So that you
>      want to talk about factors, the CAM audits
>      entered into the motivation to settle.  Maybe
>      they were leverage that Ruby Tuesday had
>      over Simon, and maybe Simon had some
>      other leverage over Ruby Tuesday to get
>      there, but once Ruby Tuesday had those CAM
>      audits and decided to say, we are not gonna
>      use them, we are gonna negotiate our

> settlement on these leases, on these early
> termination of leases, they basically jumped
> over to saying, I am using them but I am not
> gonna tell you "tangentably" [sic] or tangibly
> what percentage of the negotiation that they
> had.  So that is my hammer, I am using it, and
> I am using it to negotiate a settlement, an
> early termination of a lease and possibly even
> lease extensions which we can't quantify.  We
> don't know what impetus the CAM audits had
> on the ultimate resolution, but we knew that
> they had some.  And according to the
> contract, my expansive interpretation of the
> contract, if they used them and it helped them
> negotiate these favorable early termination
> amounts, then they should, my client, my
> ultimate client, U.S. Accu-Measurements and
> Ross Consulting, should get 50 percent of the
> savings.

Chodor Dep. Tr., Exhibit P, at 65:13-66:23.

77.    When asked to explain how plaintiffs' damages could possibly

exceed $526,000, or half the full alleged value of the Simon lease audit,

Chodor explained that this conclusion is again based upon his "expansive

view" of the contract, and offered an alternative, "less expansive view" as

well.  He testified as follows:

> Q:    [Attorney Edward Greenberg]  Would you
> please explain how your client's damages
> relevant to the Simon claim could possibly be
> greater than 50 percent of the full value of the
> claim prepared by your clients, which was
> $1,052,000?  In other words, how could your
> client's damages on this part of the case be
> greater than $526,000?

A:   [Lawrence Chodor]  Okay.  Based on my analysis of the contract, it is my understanding that any refunds in cash, kind, or by way of rental credit, [plaintiffs] would be entitled to, we will call it the 50 percent commission.  So the first step in the process was submitting the CAM audits, $1,052,000.  Those were submitted to Ruby Tuesday and accepted by Ruby Tuesday, passed on to Simon properties.  As time goes by, they negotiate.  Not only are they negotiating for the CAM charges, they are negotiating lease renewals and lease terminations.  It is all blended into one negotiation.  Ultimately, the resolution is that [Ruby Tuesday] save[s] $1,552,000 by getting lease termination agreements on all of these leases.  So my expansive view of the contract is that [plaintiffs] are entitled to 50 percent of the savings that Ruby Tuesday got as a result of utilizing these lease audits in the negotiation process.  . . . If you wanted me to give you an opinion on a less expansive view, I can – well, you have asked me.  I can give you that opinion that if we take a less expansive view and hold [plaintiffs' remuneration] to only what was submitted on the lease audits, then I would say a less expansive view of the contract would be that they would be limited to 50 percent of the $1,052,000.

Q:   . . . Do you have a view that is not expansive at all?

A:   No.

Chodor Dep. Tr., Exhibit P, at 44:22-45:22, 46:14-46:23, 49:17-49:19.

78.     When asked whether he agreed that, if the contribution of Gorodesky's factors toward the Simon settlement is assigned the value "X" as in algebra, plaintiffs' compensation would be equal to $1,052,000 minus "X" times 50 percent, Chodor testified as follows:

> Q:   [Attorney Edward Greenberg]  So if any of [Gorodesky's] factors did come into play, and you admit you don't know if they did, and they were worth the unknown value of "X", then will you agree that your client's damages would be $1,052,000 minus "X" times 50 percent?

> A:   [Lawrence Chodor]  No.  I would agree that they would be the more expansive view, the difference between the more expansive amount and the $1,052,000.  That I would agree that maybe some of that would be reduced.  But as far as the lease audit, it is still $1,052,000.  And whether or not Simon and Ruby Tuesday factored that in, Ruby Tuesday's contractual agreement with Ross and Mayer was that they would get 50 percent of the savings, in kind or in credit.  So they would be entitled to, at a minimum, half of the $1,052,000.  That is my less expansive view.  And I would agree with you on that, that if some weight can be applied to those other factors, that the more expansive view would come down closer to the audit.  The CAM audit.

> Q:   But your professional opinion is that by subtracting a value for those other factors, you still can't get below $1,052,000?

> A:   Correct.

Chodor Dep. Tr., Exhibit P, at 104:3-105:1.

79.     Despite Chodor's admission that under his "more expansive view" plaintiffs' compensation should be "reduced" by the contribution of Gorodesky's factors to settlement, his admission that he has no basis to believe that Gorodesky's factors were *de minimis*, and his denial that he attributed all savings to plaintiffs' audit, Chodor nonetheless concluded using his "more expansive view" that plaintiffs are entitled to $833,745, half of *all* savings achieved in the Simon settlement.  Chodor Supplemental Report, Exhibit O, at "Exhibit I" of document; Chodor Dep. Tr., Exhibit P, at 65:13-66:23, 67:2-68:11, 104:3-105:1.

### CHODOR'S TESTIMONY REGARDING GGP SETTLEMENT AND AUDIT VALUES

80.     When questioned regarding the GGP settlement, Chodor testified as follows:

> Q:   [Attorney Edward Greenberg]  When Ruby Tuesday was negotiating with General Growth Properties, do you know whether any of Gorodesky's factors came into play in that negotiation?
>
> A:   [Lawrence Chodor]  I do not know.

Chodor Dep. Tr., Exhibit P, at 106:4-106:8.

81.     When asked whether plaintiffs' damages would be reduced by

the contribution of other factors to the GGP settlement, Chodor testified as

follows:

> Q:   [Attorney Edward Greenberg]  If you apply
> the 100 percent minus "X" for the unknown
> factors on the General Growth Properties
> deal, how far below $900,000 could that go?
>
> A:   [Lawrence Chodor]  . . . I would not use that
> X factor to go below the $900,000 number.  I
> think that in that instance what we are talking
> about is that they had a duty, Ruby Tuesday,
> to utilize and confide in, confer with, U.S.
> Accu-Measurements and Ross Consulting,
> and they breached that responsibility and
> maybe accepted a lower amount as a result of
> that.  So my opinion is that they are entitled –
> U.S. Accu-Measurements and Ross
> Consulting are entitled to 50 percent of the
> lease audit amount.
>
> Q:   . . . Those other factors can't bring [plaintiffs'
> damages] below 100 percent; that's what
> you're saying.  They don't apply?
>
> A:   Right, because [plaintiffs] are entitled to 50
> percent of their audit findings if they were
> utilized in any way to negotiate a settlement.

Chodor Dep. Tr., Exhibit P, at 105:5-107:5.

82.     Chodor testified that he had "no opinion," however, when asked

if he believed Ruby Tuesday would have achieved a more favorable

settlement with GGP had plaintiffs been more involved.  He testified as follows:

> Q:   [Attorney Edward Greenberg]  Is it your opinion that the settlement achieved with GGP would have been for a higher value had Ruby Tuesday done what you assert it was required to do as far as keeping plaintiffs involved?
>
> A:   [Lawrence Chodor]  No, I do not have an opinion on that.  I really don't know if it would have been different.

Chodor Dep. Tr., Exhibit P, at 38:20-39:2.

83.    Chodor further admitted that he does not have an opinion regarding the "true value" of the GGP audit.  He testified as follows:

> Q:   [Attorney Edward Greenberg]  We have already established that Ruby Tuesday got the landlord to agree to pay $165,000 of the $900,000 [GGP audit] claim, correct?
>
> A:   [Lawrence Chodor]  Correct.
>
> Q:   Do you have an opinion as to whether the true value of the claim was greater than $165,000 and closer to $900,000?  And if so, what is the basis for that opinion?
>
> A:   Okay.  I do not have an opinion on that.

Chodor Dep. Tr., Exhibit P, at 40:12-40:20.

84.    In fact, when questioned regarding the value of the Simon and GGP audits, Chodor admitted that he accepted plaintiffs' allegations that the

audits were worth $1,052,000 and $900,000, respectively, without

verification or analysis.  Chodor Dep. Tr., Exhibit P, at 31:22-34:12, 35:13-

36:24.

85.    Chodor testified simply, "I was not engaged to verify it."

Chodor Dep. Tr., Exhibit P, at 32:22-32:25.  He testified as follows:

> Q:    [Attorney Edward Greenberg]  [Y]ou say in
> your report that [plaintiffs' Simon and GGP
> audits] established numerous overcharges,
> correct?
>
> A:    [Lawrence Chodor]  Correct.
>
> Q:    What is your basis for that statement?
>
> A:    My basis for that statement is conversations
> with Mr. Ross and Mr. Mayer.
>
> Q:    So they told you that their common area
> maintenance audit reports established that the
> landlords overcharged Ruby Tuesday?
>
> A:    Correct.
>
> Q:    Did you accept that allegation without
> verifying it?  And if you verified it, please tell
> us how.
>
> A:    I did ask them to provide some more detail on
> the claim.  And what they told me was they
> presented the CAM claim, their audit reports,
> to Ruby Tuesday.  Ruby Tuesday accepted
> their findings and passed them on to Simon.
> That is the extent of my verification.

Q:   You did nothing else to verify your clients'
     allegations that their reports established
     overcharges; is that true?

A:   Correct.  I was not engaged to verify it.  I was
     advised, both by counsel and by the client,
     Mr. Mayer and Mr. Ross, that this was the
     chain of events, this is what happened, and I
     accepted it at that point.

Q:   So the scope of your engagement did not
     include an analysis by you of the CAM audit
     claims that were prepared by your clients to
     evaluate their merit?

A:   Correct.

Q:   . . . [O]ne of the things you said in your report
     was that the value of the claim plaintiffs
     prepared against Simon was $1,052,000.  Did
     you do anything to confirm that that was an
     accurate value for that claim?

A:   No, I did not.

Q:   So again, that is an allegation that was
     provided to you by your clients, and you
     accepted it without verification?

A:   I accepted it without further verification, other
     than discussing it with them and with counsel
     and being advised that they submitted the
     reports to Ruby Tuesday and they were
     accepted by Ruby Tuesday.

Q:   . . . Just so we are clear, you don't know
     whether or to what extent the CAM audit that
     your clients prepared against Simon asserting
     an entitlement to a refund of $1,052,000 was
     vulnerable to challenge, true?

34

     A: That's true.

Chodor Dep. Tr., Exhibit P, at 31:22-34:12.

   86. When questioned regarding the GGP audit, Chodor similarly

testified as follows:

     Q: [Attorney Edward Greenberg]  When you said
       in your report that the value of the [GGP
       audit] claim was estimated through 2007 to be
       approximately $900,000, where did you get
       that?

     A: [Lawrence Chodor]  I was given that amount
       by Mr. Mayer and Mr. Ross.

     Q: Did you do anything to verify that $900,000
       was a proper value for that claim?

     A: I did.

     Q: What did you do?

     A: I interviewed Mr. Mayer and Mr. Ross, asked
       them where they came up with that number.
       And once again, they advised me that they
       had prepared a report, submitted that report to
       Ruby Tuesday, it was accepted by Ruby
       Tuesday and passed on to the landlord.  That
       was my verification process.

     Q: Did you do anything else?

     A: I did not.

     Q: Again, as with the Simon CAM audit claim
       report, is it correct that you did not yourself
       evaluate the strengths and weaknesses of the

> CAM audit claim that Ross Consulting and
> U.S. Accu-Measurements prepared with
> regard to the Mizner Park mall properties?
>
> A:   . . . That's correct.
>
> Q:   And you don't know whether or to what
> extent the CAM audit claims made with
> regard to Mizner Park were vulnerable to
> challenge?
>
> A:   I do not know.

Chodor Dep. Tr., Exhibit P, at 35:13-36:24.

87.    Chodor further testified that he does not know if Ruby Tuesday

received full value on the audit claim in its settlement with Simon.  He

testified as follows:

> Q:   [Attorney Edward Greenberg]  What basis, if
> any, do you have for the conclusion that Ruby
> Tuesday got 100 cents on the dollar for the
> claim plaintiffs prepared against Simon?
>
> A:   [Lawrence Chodor]  I don't have any basis for
> that, nor do I state that in my report.

Chodor Dep. Tr., Exhibit P, at 50:11-50:16.

## CHODOR'S METHODOLOGY

88.    To determine the value of plaintiffs' alleged damages from the Simon audit, Chodor did **not** attempt to ascertain what *portion* of savings achieved by Ruby Tuesday in its settlement with Simon *was the result of* plaintiffs' audits, if any.  *See generally*, Chodor Report, Exhibit M; Chodor Supplemental Report, Exhibit O; Chodor Dep. Tr., Exhibit P.

89.    Chodor admitted he could not ascertain what *portion* of savings achieved by Ruby Tuesday in its settlement with Simon *was the result of* plaintiffs' audits, if any.  Chodor Dep. Tr., Exhibit P, at 94:17-94:19 ("I have no way of knowing what percentage, what contribution to the settlement any of these individual items had, including the CAM audits.").

90.    Chodor did **not** review the leases, CAM charges, applicable statutes of limitation, or plaintiffs' extrapolations from property to property and year to year underlying the Simon audit in order to determine whether plaintiffs in fact documented a valid claim for $1,052,000 in overcharges. *See* Chodor Report, Exhibit M; Chodor Supplemental Report, Exhibit O; Chodor Dep. Tr., Exhibit P, at 31:22-34:12, 35:13-36:24.

91.    Chodor did **not** review plaintiffs' own evaluations of the Simon audit to consider plaintiffs' widely ranging valuations of the audit, plaintiffs' recommendations that Ruby Tuesday offer to settle the audit for

as low as one-seventh of its purported value, or plaintiffs' concessions that portions of the audit were "not rock solid" or even "without merit" to assess the audit's realistic value at settlement with Simon, if any.  *See* 1998 Agreement, Exhibit A, at ¶4; Chodor Report, Exhibit M; Chodor Supplemental Report, Exhibit O; Chodor Dep. Tr., Exhibit P, at 31:22-34:12, 35:13-36:24.

92.     Chodor did **not** utilize industry data to assess the audit's realistic value at settlement or the likely weight given to the audit in a lease termination settlement with Simon, if any.  *See generally*, Chodor Report, Exhibit M; Chodor Supplemental Report, Exhibit O; Chodor Dep. Tr., Exhibit P.

93.     Chodor did **not** draw from personal experience to test the likely weight given the audit at settlement or the value the audit likely garnered, if any.  *See* Chodor Report, Exhibit M; Chodor Supplemental Report, Exhibit O; Chodor Dep. Tr., Exhibit P, at 89:9-89:18 ("I previously stated that I have not been involved in a lot of lease termination negotiations.  So, do I know that this is an accurate range [of typical settlement results]?  No.").

94.     Chodor testified that he instead accepted plaintiffs' allegations regarding audits without verification and, because he could not quantify the relative contribution of *any* factor toward settlement, he utilized an

"expansive view" to conclude that plaintiffs are entitled to half of *all savings* achieved in the Simon settlement. *See generally*, Chodor Report, Exhibit M; Chodor Supplemental Report, Exhibit O; Chodor Dep. Tr., Exhibit P, at 31:22-34:12, 35:13-36:24, 56:2-56:17, 61:8-62:1, 67:2-68:11.

95.     To determine the value of plaintiffs' alleged damages regarding the GGP audit, Chodor did **not** attempt to ascertain whether Ruby Tuesday achieved savings greater than $165,000 in its settlement with GGP. *See generally*, Chodor Report, Exhibit M; Chodor Supplemental Report, Exhibit O; Chodor Dep. Tr., Exhibit P, at 39:3-40:20.

96.     Chodor did **not** attempt to determine whether the GGP audit was realistically worth more than $165,000. Chodor Dep. Tr., Exhibit P, 40:12-40:20. *See generally*, Chodor Report, Exhibit M; Chodor Supplemental Report, Exhibit O.

97.     Chodor did **not** attempt to determine whether Ruby Tuesday could have achieved a more favorable settlement had plaintiffs been more closely involved. Chodor Dep. Tr., Exhibit P, 38:20-39:2. *See generally*, Chodor Report, Exhibit M; Chodor Supplemental Report, Exhibit O.

98.     Chodor testified that he instead accepted plaintiffs' allegations that Ruby Tuesday was contractually required to involve plaintiffs in settlement negotiations but failed to do so, and concluded, "so my opinion is

39

that [plaintiffs] are entitled to 50 percent of the lease audit amount." Chodor

Dep. Tr., Exhibit P, at 105:14-105:22. See also id. at 38:6-38:9 ("[I]n my

opinion, the contract reads that they should be involved in the process . . .

and that they were not.").

> Respectfully submitted,
>
> WARD GREENBERG HELLER & REIDY LLP

By: _____

> Edward A. Greenberg (EAG 3642)
> 1835 Market Street, Suite 650
> Philadelphia, PA  19103
> (215) 836-1100
>
> Attorneys for Defendant