**EXHIBIT "L"**



**RESTAURANT ADVISORY SERVICES**

63 Chestnut Road, Suite 6A
Paoli, PA 19301
P.215.616.8901
F.215.616.8919
ron@ras.us.com

September 11, 2011

Edward A. Greenberg, Esq.
Ward Greenberg Helller & Reidy LLP
1835 Market Street, Suite 650
Philadelphia, PA 19013

Re: U.S. Accu-Measurements, LLC., et al. v. Ruby Tuesday, Inc.

Dear Mr. Greenberg:

I am pleased to present our findings and conclusions regarding the above-referenced litigation.

This report is based on estimates, industry guidelines and my experience in the restaurant and real estate industries. The terms of this engagement are such that there is no obligation to revise this report to reflect events or conditions that occur subsequent to the date of the completion of our work. However, I reserve the right to revise this report or include as exhibits any additional information received after the date of issuance of this report.

All direct and indirect information supplied is believed to be reliable and correct. No responsibility is assumed for information supplied by others and this information is believed to be reliable and correct.

Documents Reviewed

To complete this analysis, I reviewed the following documents:

- Economic Damages Report for Plaintiff, prepared by Wiss and Company, LLP, dated August 15, 2011 ("Wiss Report").

- Letter from Edward A. Greenberg, September 1, 2011 ("Discrete Issues Letter"), presented as Exhibit I.

Edward A. Greenberg, Esq.
Ward Greenberg Helller & Reidy LLP
September 11, 2011
Page 2.

Review of Wiss Report

I reviewed the Wiss Report for its consideration of factors potentially causing the discounts agreed to as part of a lump sum settlement between the Defendant and its Landlords. The Wiss report appears to give zero weight to any factor other than CAM audits in its damage calculations, which in our opinion renders its conclusion incorrect.

Factors typically considered by a landlord when agreeing to terminate a lease for a lump sum payment are detailed later in this report.

Issues Raised in Discrete Issues Letter

The Discrete Issues Letter asked four questions. The questions and respective answers are detailed below.

*What factors does a mall (or shopping center) landlord consider when one of its tenants closes its store before the expiration of the lease and seeks an agreement to terminate the lease in exchange for a lump sum payment?*

Shopping center and mall (collectively termed "Retail Centers", or "Centers") landlords, like all landlords, seek to maximize the value of their real estate investments. Retail Centers are programmed by their owners for an optimum mix of retail tenants, including restaurants. This mix creates the environment required to attract patrons to the Centers, and it is this mix that in fact attracts tenants to lease in the Center. It is the quality and mix of tenants as well as maximum occupancy that provides long-term stability and value to the Retail Center.

Vacancy in any Retail Center creates distress in that center, and the distress can be quantified at a significantly higher number than just the rental value of the empty space. When tenants leave, that tenant's customers also leave, diminishing the customer population for the rest of the Center. Tenant vacancy can therefore be self-accelerating, since fewer customers means less revenue for remaining tenants. Therefore, the real retail vacancy cost ("Retail Vacancy Cost") may bear little relation to the actual value of the rental stream lost. Moreover, Retail Center lenders and appraisers are keenly aware of this, and valuations and lending capacity can be substantially compromised by vacancy.

Certain types of tenants and tenant locations carry a higher than average Retail Vacancy Cost. Free standing pad sites or end cap locations at Retail Centers bear the highest Retail Vacancy Cost, due to their prominent locations in the Center. Similarly, large anchor tenants like department stores, as well as restaurants, bear a larger than average Retail Vacancy Cost, due to their ability to attract large numbers of customers.

Retail Center landlords are therefore anxious to re-lease closed stores as quickly as possible, even if they can collect the balance of all sums owed under the lease.

Edward A. Greenberg, Esq.
Ward Greenberg Helller & Reidy LLP
September 11, 2011
Page 3.

    This is a major factor that a landlord considers when agreeing to terminate a lease for a lump sum payment.

    Other factors include:

- <u>Duty to mitigate.</u>  Landlords typically have a duty to mitigate their damages, required by either a "duty to mitigate" clause in the lease or by law.  This requires the landlord to attempt to mitigate its damages by re-leasing the space.  This duty to mitigate often reduces the total amount of rent recoverable from the tenant.

- <u>Tenant improvements value transferred to landlord.</u>  Typically, value created by the tenant, which for restaurants often includes costly building mechanicals, are transferred to the landlord at the end of lease.  In addition, furniture, fixtures and equipment, typically provided by the tenant and retained by the tenant at lease termination, can be transferred to the landlord at early lease termination for consideration.  Landlords want this since a fully equipped restaurant typically has more value than a stripped out restaurant.

- <u>Landlord's ability to obtain higher or additional rent.</u>  Higher rents for a new tenant may be achievable due to a number of factors, including, as mentioned above, an improved space being rented (especially when the former tenant received the space as unimproved and at its expense, constructed the restaurant). Moreover, since a lump sum payment by the tenant effectively pays future rents ("Advanced Rent Payments"), it is possible that a new tenant's rent payment will overlap the Advanced Rent Payments, giving the landlord "double rent".  In addition, current market factors can have impacts, both positive and negative, on future potential rents.

- <u>Satisfaction of potential claims.</u>  Landlords may consider the possibility of claims by the tenant, both known and unknown, as a factor when terminating a lease for a lump sum payment.

- <u>Financial viability of the tenant.</u>  Landlords will typically be more aggressive in terminating leases with financially viable tenants, since they will assume that such tenants have the best ability to pay and will not wish to face costly litigation. Conversely, financially weak tenants will often get greater overall discounts since the Landlord will be concerned about its risk in a potential tenant bankruptcy.

- <u>Length of remaining lease term.</u>  The remaining length of a lease term is an important factor, but depending on the other factors, this may be a positive or negative impact.

Below:

Edward A. Greenberg, Esq.
Ward Greenberg Helller & Reidy LLP
September 11, 2011
Page 4.

*How do the factors impact the landlord's assessment of the amount the tenant would have to pay in exchange for the landlord's agreement to terminate the lease?*

Please see answer above.

*What is the range of discounts, expressed as a percentage of total future rent due, that you have seen in lease termination agreements?*

The range of discounts can vary greatly depending on all the factors outlined above. In my experience, the discount range can be from 10 percent to 90 percent, with 40 to 50 percent being most typical.

*In your experience, how do the largest mall and shopping center landlords typically respond to CAM audits?*

The largest Retail Center landlords are large companies with financial audit requirements for their partners/shareholders. They are meticulous in their CAM calculations, and rigorously defend those calculations. However, CAM language is often different in every lease, and sometimes landlords make mistakes. In my experience, when mistakes are made they are quickly resolved to maintain good relations with tenants.

I would be pleased to hear from you if I can be of further assistance in the interpretation and application of our findings.

Respectfully submitted,

**RESTAURANT ADVISORY SERVICES, INC.**

By: _____
Ronald N. Gorodesky, President



NEW YORK   PENNSYLVANIA   NEW JERSEY   DELAWARE

EDWARD A. GREENBERG
T. 215 836 1880
F. 215 836 2845
EGREENBERG@WARDGREENBERG.COM

September 1, 2011

*Via E-Mail*

Ronald N. Gorodesky
President
Restaurant Advisory Services, Inc.
63 Chestnut Road, Suite 6A
Paoli, PA  19301

Re:   *U.S. Accu-Measurements, LLC and Ross Consulting Group v. Ruby Tuesday, Inc.*
      *Our File No. 712589*

Dear Mr. Gorodesky:

Our firm represents Ruby Tuesday, Inc. in the captioned matter. I write to seek your expert opinion on discrete issues that have arisen in this case. I am not asking you to review the voluminous pleadings, discovery requests, discovery responses, deposition transcripts and deposition exhibits. Please limit your analysis to these issues:

> What factors does a mall (or shopping center) landlord consider when one of its tenants closes its store before the expiration of the lease and seeks an agreement to terminate the lease in exchange for a lump sum payment?

> How do the factors impact the landlord's assessment of the amount the tenant would have to pay in exchange for the landlord's agreement to terminate the lease?

> What is the range of discounts, expressed as a percentage of total future rent due, that you have seen in lease termination agreements?

WARD GREENBERG HELLER & REIDY LLP

1835 MARKET STREET SUITE 650 PHILADELPHIA, PA 19103 T. 215 836 1100 F. 215 836 2845 WARDGREENBERG.COM

Ronald N. Gorodesky
President
Restaurant Advisory Services, Inc.
September 1, 2011
Page 2

In your experience, how do the largest mall and shopping center landlords typically respond to CAM audits?

Very truly yours,

*Edward A. Greenberg*

Edward A. Greenberg

EAG/mm

# RONALD N. GORODESKY

## Qualifications in Hospitality, Restaurant and Food Service Advisory Services

Ronald Gorodesky has over 30 years of experience in various aspects of the hospitality industry and has extensive experience in the planning, development and management of a wide variety of leisure time industry projects with particular emphasis on the multiple aspects of the food service industry. Mr. Gorodesky's background includes diversified experience in food and beverage operations in free-standing restaurants, nightclubs, and hotels. He has also been involved in operational analyses for a variety of food service industry clients. Mr. Gorodesky's varied experience in the hospitality industry allows him to provide broad-scope planning assistance and project evaluation skills to industry analysts, developers and investors.

Mr. Gorodesky's areas of specialization include the following:

- Food and beverage operations with emphasis on internal controls and management information systems;

- Assessment of project feasibility and preparation of financial estimates for a variety of food service industry projects including independent restaurants and nightclubs, restaurant chains and free-standing catering facilities;

- Market research and feasibility analysis for leisure establishments which contain significant food service elements such as country clubs, theatres and stadiums;

- Evaluation of food service concepts, marketing programs and menu design; and

- Valuation of food service industry developments, including cash flow and valuation analyses in support of litigation.

Mr. Gorodesky has directed the preparation of feasibility studies, financial analyses, damage reports and evaluation of hotel, restaurant and mixed-use projects. In addition, Mr. Gorodesky has been accepted as an expert witness in various courts and has testified in many areas related to the restaurant business.

Mr. Gorodesky directed the food and beverage consulting practice at the Philadelphia office of Laventhol & Horwath for six years. In March 1990, Mr. Gorodesky formed Restaurant Advisory Services, serving as its President.

Mr. Gorodesky is an active member in the Pennsylvania Restaurant Association, the National Restaurant Association and the Penn State Hotel and Restaurant Society. He has served multiple terms on the board of directors for the Philadelphia-Delaware Valley Restaurant Association and the Advisory Board for Penn State Great Valley. He is currently serving on the Advisory Committee to the Hotel Restaurant and Institutional Management School for Penn State Berks Campus. He is a guest instructor for Penn State's Hotel, Restaurant and Institutional Management program, and is currently co-teaching a senior level course on Hospitality Entrepreneurship. He has been responsible for the collection and analysis of restaurant operating data for the publication of the Pennsylvania annual statistical report, The RAS Report. Mr. Gorodesky is a licensed real estate broker in both Pennsylvania and Florida.

Mr. Gorodesky received a Bachelor of Science degree in Hotel, Restaurant and Institutional Management from The Pennsylvania State University.